# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 26, 2011

## STATE OF TENNESSEE v. DENISE DIANNE BRANNIGAN

**Appeal from the Circuit Court for Carter County**
**No. S19912    Robert E. Cupp, Judge**

**No. E2011-00098-CCA-R3-CD - Filed June 13, 2012**

The Defendant, Denise Dianne Brannigan, was convicted by a Carter County jury of theft of property valued at more than $500 but less than $1,000 and three counts of fraudulent use of a credit card involving a value equal to or less than $500. Following a sentencing hearing, the trial court imposed terms of 5 years for the theft conviction and 11 months and 29 days for each fraudulent use of a credit card conviction. The trial court ordered consecutive service of the 5-year sentence and two of the 11-month and 29-day sentences. In this direct appeal, the Defendant argues (1) that the trial court erred by allowing evidence of prior uncharged conduct under Tennessee Rule of Evidence 404(b) and (2) that her sentence was excessive. After our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JERRY L. SMITH, J., not participating.

David L. Robbins (on appeal), Elizabethton, Tennessee, and Matthew A. Carter (at trial), Johnson City, Tennessee, for the appellant, Denise Dianne Brannigan.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Anthony Wade Clark, District Attorney General; Melanie Futrell Widener, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The case arises from the Defendant's criminal activity with her neighbor and co-defendant, Renee Fiester, on December 17, 2008. The two women set out to steal money from a local business in an effort to obtain funds for the Defendant to pay her delinquent

utility bill. As a result of this escapade, a Carter County grand jury indicted the Defendant on September 1, 2009, for one count of theft over $500 and five counts of fraudulent use of a credit card. See Tenn. Code Ann. §§ 39-14-103, -115, -118. A jury trial was held on April 22, 2010.

Before the indictment was read to the jury, the State nolled two of the fraudulent use of a credit card counts, Counts 5 and 6. The remaining four counts—Count 1, theft of property valued at more than $500 but less than $1,000; Count 2, fraudulent use of credit card in the amount of $264.12; Count 3, fraudulent use of a credit card in the amount of $86.73; and Count 4, fraudulent use of a credit card in the amount of $252.61—proceeded to trial.

First to testify was Renee Fiester. Ms. Fiester stated that in December 2008, she was living in Butler, and the Defendant lived across the street from her. At that time, she had known the Defendant for approximately one to two years. According to Ms. Fiester, the Defendant did not work at that time, moreover, Ms. Fiester did not know how the Defendant managed to support herself. The Defendant frequently spoke with Ms. Fiester about her finances, and according to Ms. Fiester, the Defendant "would be panicking all the time."

On the morning of December 17, 2008, she went to visit the Defendant. While at the Defendant's residence, the Defendant informed Ms. Fiester that her utilities were about to be shut off because she was past due on payment. Ms. Fiester stated that she would help the Defendant obtain the funds to pay her bill by stealing the money. Ms. Fiester relayed that she did not have a financial need at that time and was only stealing the money because she "felt sorry" for the Defendant. Ms. Fiester admitted that she was an experienced thief, having multiple convictions for theft in several different states; most of these convictions resulted from shoplifting or taking women's wallets. Ms. Fiester claimed that prior to December 2008, it had been approximately eight years since the last time she had stolen from a store. She blamed her criminal history on her drug usage and claimed that she was no longer abusing drugs.

According to Ms. Fiester, she and the Defendant formulated a plan, which consisted of the two women going into a store, the Defendant distracting the employee, and Ms. Fiester stealing the employee's wallet. Ms. Fiester confirmed that she had done something like this approximately 10 to 20 times before this incident.

They left the Defendant's house, and the Defendant drove Ms. Fiester's husband's truck to Hampton. Ms. Fiester opined that she was a bad driver and that people did not like to ride with her, so the Defendant drove. After scouting the area for a business to steal from, they parked at an antique store, Legacy Resale, pursuant to Ms. Fiester's instruction.

However, the two women first went across the street to Country Merchants, a baby store. After several minutes at the baby store, Ms. Fiester left and went to the antique store alone, where she browsed for a period of time. About eight minutes later, the Defendant entered. Ms. Fiester heard the Defendant ask the store employee to help her with something; however, Ms. Fiester aborted the plan to steal from that store because there were two women in the store and "it's hard to distract two women." While she did not steal any money from a store employee at Legacy Resale, Ms. Fiester admitted that she did take a pair of baby shoes.

After Ms. Fiester exited the antique store, she went to the truck and waited for the Defendant, who arrived five or six minutes later. According to Ms. Fiester, the Defendant did not have any purchases with her. They did not discuss what to do next; the Defendant just kept driving until Ms. Fiester saw another opportunity to carry out their plan. Ms. Fiester chose the Shop Around the Corner in Elizabethton; she had frequented there before.

Again, Ms. Fiester went inside the store first, followed by the Defendant about two minutes later. The Defendant engaged the store owner, Nancy Glover, in conversation, inquiring about certain items for sale, and the Defendant and Ms. Glover then went to the back of the store to look for the items the Defendant sought. Ms. Fiester, who had remained in the front of the store, went to the counter and took Ms. Glover's wallet from her purse. Ms. Fiester left the store and went back to the truck. She rummaged through the wallet; it contained approximately $300 in cash, $500 in checks, and several credit cards. After removing the cash and credit cards, Ms. Fiester returned the checks to the wallet and placed the wallet in a mailbox on the side of building.

About eight minutes later, the Defendant emerged from the store and got in the truck; the Defendant did not have any purchases with her. Ms. Fiester gave the Defendant half of the money from the wallet, saying "here's the money to pay your bills." According to Ms. Fiester, the Defendant replied, "Thank you." The Defendant also saw Ms. Glover's credit cards at this time. Ms. Fiester asked the Defendant if she wanted to use them, and the Defendant said "yes."

They left the Shop Around the Corner and drove to an Exxon gas station. Ms. Fiester went inside the gas station, while the Defendant pumped gas. As she was leaving to go inside the store, Ms. Fiester asked the Defendant what she needed, and the Defendant responed that she needed cigarettes. Ms. Fiester used one of Ms. Glover's credit cards to pay for the gas and to buy cigarettes and other items for both her and the Defendant. When she returned to the vehicle, she gave the Defendant her cigarettes. The State entered into evidence a receipt reflecting a purchase of $86.73 at the Zoomerz Exxon. Ms. Fiester confirmed that she did not have Ms. Glover's permission to use her credit card for this purchase.

They drove away from the gas station and went to a nearby Family Dollar Store. It was Ms. Fiester's idea to go to the Family Dollar Store. They went inside the store together; both getting a shopping cart and shopping for household items. After filling her cart, Ms. Fiester paid for the items with one of Ms. Glover's credit cards; a purchase totaling $264.12. The Defendant was behind Ms. Fiester at the register with a cart full of items and attempted to pay with one of the stolen credit cards given to her by Ms. Fiester. The first credit card the Defendant attempted to use to purchase the items was the same card Ms. Fiester used at the Exxon. The card was declined three times, so Ms. Fiester gave the Defendant another card, which was approved, for a purchase totaling $252.61. They then exited the Family Dollar Store.

Ms. Fiester relayed that she had taken some Loratabs that day before stealing the wallet. Ms. Fiester acknowledged that she too had been charged in connection with these offenses, ultimately pleading guilty. She had not been sentenced at the time of the Defendant's trial, but she averred that she had not been promised anything in exchange for her testimony against the Defendant. When asked why she was testifying against the Defendant, Ms. Fiester replied, "My husband told me that I had to tell the truth."

On cross-examination, Ms. Fiester recalled that they took her husband's truck to Hampton because the Defendant had some baby items she wanted to sell at Country Merchants. When Ms. Fiester left the baby store to go across the street to Legacy Resale, the Defendant was still trying to sell her items at the baby store.

Ms. Fiester testified that she had made restitution to the victims in this case, except for the Family Dollar Store. When asked if she hoped for leniency from the State in exchange for her testimony, Ms. Fiester responded, "It would be nice, but I didn't ask for it."

Ms. Fiester acknowledged that on prior occasions, she had paid for the Defendant's things with her debit card and that the Defendant had given her cash in return because the Defendant did not have a credit card. She confirmed that the Defendant was behind her in the check-out line at the Family Dollar Store. Although uncertain, she stated that she could have left briefly to put her things in the truck, but if she did so, she then returned to the Defendant at the check-out line. She was adamant that she did not pay for the items in both carts.

Next, Judith Reece, a cashier at the Family Dollar Store in December 2008, was called to testify. Ms. Reece verified the receipts from the Family Dollar Store that were admitted into evidence. When asked if she remembered the two individuals associated with these transactions, Ms. Reece stated, "Not really." Ms. Reece then provided the following narrative of what she did remember about the transactions that day:

I just remember there was two ladies that came in and they had bought quite a bit of stuff. And they came in together and they paid for one order, or whatever, and then she went back outside. Then she came back in after the other card had [been] declined three times, and then she handed her that card.

She did not believe she could recognize either of the two women.

On cross-examination, Ms. Reece provided, "I remember the transactions I just don't remember the faces." She explained that the store was busy at that time. According to Ms. Reece, the two ladies entered the store together, proceeded to shop, and arrived at the check-out line at the same time. She could not recall which one of the ladies went out to the truck and then returned inside the store.

Barbara Wooten testified that she was the assistant manager of Zoomerz Exxon in Elizabethton. At the request of the authorities, she retrieved the December 17, 2008 footage from the gas station's surveillance camera. She then verified the receipt from the Exxon reflecting Ms. Fiester's purchases on that day. She also identified a still photograph obtained from the store's surveillance footage, which reflected the gas station as it appeared at 12:41:33 p.m. on December 17, 2008.

The owner of Legacy Resale, Violet Hurt, was next to testify. She testified that she ran an antiques and collectibles business in a two-story house in Hampton. She was asked to relay the details of the incident involving the Defendant and Ms. Fiester on December 17, 2008. Ms. Hurt detailed that two women came into her store that day, that they did not enter the store together, that one woman came to the counter and inquired about the items in the "showcase," and that the other woman came inside and continued through the store. Ms. Hurt then identified the Defendant as the woman who came to the "showcase" asking her questions. According to Ms. Hurt, the Defendant was acting nervous and her hands were shaking. The Defendant did not purchase anything. After the two women left, Ms. Hurt noticed that a pair of baby shoes was missing.

Ms. Hurt testified that she had a security camera in each room of the store. She relayed that she provided the surveillance footage to the authorities.

On cross-examination, Ms. Hurt was unable to recall if the Defendant asked about silhouette pictures or "depression glass." According to Ms. Hurt, only "small collectible items" were in the "showcase," which did not include silhouette pictures, and she believed that they only spoke about items actually in the store.

Linda Glover, the owner of the Shop Around the Corner was called to testify. Ms. Glover detailed the events of December 17, 2008. She was working the store by herself that day. The first lady entered the store and said "[s]he was hunting something for her mother[.]" Ms. Glover identified this first individual as the Defendant. Ms. Glover continued that the "other lady" came in right after the Defendant, and Ms. Glover said to her, "I'll be right with you." She then escorted the Defendant into another room to "show her some things." Very shortly thereafter, Ms. Glover heard the front door open again, so she went back to the front of the store to look and saw the other lady "darting" across the street and "down the alley behind the Bonnie Kate Theatre." The Defendant, who had remained in the back of the store, then emerged and talked with Ms. Glover before leaving. The Defendant did not purchase anything from Ms. Glover.

Later that day, after receiving a phone call from her credit card company, Ms. Glover looked inside her purse and noticed that her wallet was missing. According to Ms. Glover, she had a deposit ready for the bank in her wallet, which included both checks and cash totaling about $840. In addition to the deposit money, she was also missing the following items: her driver's license, her social security card, several credit cards, and some gift cards. She relayed that her name appeared on the credit cards and that neither of the women had her permission to use the cards that day.

When asked about the other woman in her store on December 17, 2008, Ms. Glover relayed that after the incident, the other woman came into the store, admitted to the theft, and paid her the money she had stolen from her. According to Ms. Glover, the women paid in full except for the value of the missing gift cards. She stated that she had seen the same woman in the courthouse earlier that day.

On cross-examination, Ms. Glover could only recall that the Defendant was interested in something for her mother; she could not remember if the Defendant asked about silhouette pictures. Ms. Glover estimated that the Defendant remained in the store talking with her for about ten minutes following the other woman's departure.

Next to testify was Sergeant Joy Markland of the Elizabethton Police Department. Sergeant Markland identified the photograph from the Zoomerz Exxon and stated that she was unable to provide the entire video because her computer was experiencing technical difficulties. Sergeant Markland then testified that she had received the videotape from Ms. Hurt of the events occurring at Legacy Resale on December 17, 2008, and the tape was played for the jury. The camera recording the events was "shooting down on" the front door; the video covered only the happenings at the front door of the store.

According to Sgt. Markland, Ms. Fiester originally denied any involvement in these offenses. Upon Ms. Fiester's request to speak with an attorney, Sgt. Markland ceased questioning her.

After the State rested, the Defendant's mother, Diane Lorraine Pechler, testified on the Defendant's behalf. Ms. Pechler testified that she and her husband owned the home in which the Defendant resided and that they paid the bills associated with the home. Ms. Pechler relayed that if the Defendant needed money, she sent her money. She also stated that she collected silhouette pictures and depression glass and that her daughter had purchased those items for her in the past. According to Ms. Pechler, it is difficult to locate those types of items, generally finding them at antique stores.

On cross-examination, the State inquired about the Defendant's employment. The Defendant's mother stated the Defendant worked for her and her husband in December 2008: "[W]hen we bought the house it was put on a piece of empty lot, and it didn't have stairs. It didn't have decks. It didn't have driveways. It didn't have landscaping, yards, bushes, some trees, flowers, nothing, and we hired her to do these things." According to Ms. Pechler, the work had not been completed and was "ongoing." When asked how much she paid the Defendant for this work, she replied, "We pay her whatever she sends a bill to us that's needed for materials . . . whatever they may be. And then we give her extra so she can have for extra living."

Ms. Pechler estimated that she sent the Defendant approximately $200 in spending money for the month of December 2008; they regularly sent $200 to $300 a month. Ms. Pechler also relayed that the Defendant worked other odd jobs when they became available. The Defendant did not have an automobile and received food stamps.

The jury found the Defendant guilty as charged. A sentencing hearing was held on August 10, 2010. At the conclusion of the hearing, the trial court imposed a 5-year sentence as a Range III, persistent offender for the theft conviction and sentences of 11 months and 29 days at 75 percent for each of the 3 counts of fraudulent use of a credit card. Counts 1 (theft), 2 (fraudulent use of a credit card), and 3 (fraudulent use of a credit card) were ordered to be served consecutively to one another, and Count 4 (fraudulent use of a credit card) was to be served concurrently with all counts. Alternative sentencing was denied. This timely appeal followed.

ANALYSIS

On appeal, the Defendant raises the following issues for our review: (1) whether the trial court erred by allowing evidence of prior uncharged conduct under Rule 404(b),

-7-

Tennessee Rules of Evidence; and (2) whether the Defendant's effective sentence, both in term length and its consecutive nature, is excessive. We will address each in turn.

## I. Prior Uncharged Conduct

The Defendant argues that the trial court improperly admitted evidence under Tennessee Rule of Evidence 404(b) of the uncharged conduct that occurred at Legacy Resale just prior to the charged offenses. On April 1, 2010, the Defendant filed a motion in limine to suppress evidence of any uncharged conduct, "including, but not limited to, uncharged conduct related to Legacy antiques." The Defendant submitted that "uncharged conduct taking place at Legacy antiques is irrelevant as it does not prove an element of any of the offenses charged and it is so highly prejudicial to the Defendant that it outweighs the probative value thereof[.]" On the same date, the Defendant also filed a motion requesting "notification of evidence that the State intends to introduce concerning the Defendant's 'prior bad acts'" and a motion for "disclosure of uncharged conduct on which the State intends to rely at trial."

On the morning of trial, the trial court considered the Defendant's motions from April 1. It did so after the jury had been selected but before trial commenced and outside of the jury's presence.

First, the trial court addressed the Defendant's motion in limine to suppress the evidence of uncharged conduct at the antique store, Legacy Resale, in Hampton. The State's theory was that the Defendant and her neighbor, Ms. Fiester, devised a plan to perpetrate a theft from a local business to secure funds for the Defendant to pay her delinquent utility bill. The prosecutor described the uncharged conduct it sought to introduce at trial: prior to the alleged theft at the Shop Around the Corner charged in the first count of the indictment, "these two ladies did the same thing, attempted the same thing at a shop in Hampton." The prosecutor asserted that the evidence was "important" because it went "directly to the [D]efendant's knowledge and intent of what was going at these later shops that they were going to." The "scheme" was for Ms. Fiester to first go inside the business alone, and at some point thereafter, for the Defendant to enter and engage the store employee in conversation, thereby creating a distraction for Ms. Fiester to commit the theft. Although this information was "handed . . . over to the county," they were never charged for their actions at Legacy Resale. The precise evidence the State sought to introduce was surveillance footage from Legacy Resale showing the two women inside the store and testimony from Ms. Fiester and from the shop owner about the events occurring therein.

The trial court recapped Rule 404(b) as follows: "[E]vidence of other crimes, wrongs, or acts are not admissible to prove character of a person or to show actions performed with the character trait. It may, however, be admissible for other purposes." The trial court then

delineated the conditions which must be satisfied before evidence is admissible under the rule. After noting the first condition, "the court upon request must hold a hearing outside the jury's presence[,]" the court stated, "We're complying with that." The court continued to read from the Rule, outlining the next three conditions:

> [(2)] The court must determine that a material issue exists other than the conduct -- conduct conforming with a character trait [and] must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence. (3) The court must find proof of [the] other crime, wrongful act, be clear and convincing. And, finally, [(4)] the court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The trial court then recited its jury charge "on evidence of other crimes":

> [I]f from the proof you find the defendant has committed other crimes, or crimes for which . . . he or she is on trial you may not consider such evidence to prove the disposition to commit such a crime . . . as that on trial, but it can be admitted for complete story, identity, a scheme or plan, motive, intent, and guilty knowledge.

Within that 404(b) framework, the prosecutor elaborated on the evidence it sought to introduce as follows:

> Ms. Fiester, the co-conspirator in this case, will testify that before they ever left the house that she and [the Defendant] came up with this plan about how they were going to commit theft. That Ms. Fiester was going to go into the shop and head to the back, and that [the Defendant] was going to come in some moments later and engage in conversation with the store clerk to distract them, so that Ms. Fiester could then conduct the thefts. The -- the ladies then leave the store and leave and get in the same vehicle and -- and go. On this particular day we have the charged conduct with is at the Shop[] Around the Corner here in Elizabethton.

> . . . .

> Count 1. And the allegation is that a bag, or wallet with monies and credit cards was taken. On that same day the same conduct was attempted at an antique store in Hampton. There is a video from that antique store, but because of -- and -- and Ms. Fiester will explain this, I don't know if the woman's purse was not available, or was not close, but there were no monies

taken from that store. There were some baby shoes taken. But, the -- [the Defendant] is engaging in conversation with the store clerk to distract her so that Ms. Fiester can accomplish the thefts. And, also, the store clerk is here to talk about that from [] Hampton. So, this video and this other store clerk it's -- it's the identical scheme or plan. It goes directly to scheme or plan, and the knowledge to confirm, and corroborate Ms. Fiester's testimony that [the Defendant] knew what was going on.

In response to the prosecutor's argument, defense counsel noted that the evidence was "coming from . . . the co-defendant in this case, the co-conspirator" and questioned the credibility of such evidence. He elaborated that the proof of the other crime, wrong, or act had to be established by clear and convincing evidence, noting that the video did not show the Defendant or Ms. Fiester steal anything but simply depicted the two ladies entering the store separately and the Defendant "standing there talking to somebody[.]"

The prosecutor further provided that the videotape, in combination with the shop owner's testimony that she saw the Defendant and Ms. Fiester leave together in the same vehicle, would provide "the whole story."[1] The prosecutor noted that the defense theory was that the Defendant was oblivious about the thefts that day—"that it was all Ms. Fiester."

In an effort to assist the trial court, the prosecutor stated, "Judge, if I need to put on proof I can do that." The trial judge then responded, "I wish you all had let me know this." After further argument from both sides, the trial court again noted its displeasure with the tardiness of the hearing, "I wish I could have seen this evidence, and I can't do it at this late time. . . . I'm not comfortable with leaving jurors back there at this -- late time." The trial court ruled that the evidence was admissible under Rule 404(b), reasoning that the evidence went to identity, scheme or plan, motive, intent, and knowledge, and that the probative value of the evidence outweighed its prejudicial effect. The court provided that it would charge the jury accordingly. The trial judge further stated that if he was "wrong on it after" viewing the videotape at trial, then he would declare a mistrial. The trial judge made a final admonition to counsel, "So, that's the court's ruling at this point without seeing it. I would . . . I really need to see those things prior to trial dates."

The trial court noted that the Defendant's motion requesting "notification of evidence that the State intends to introduce concerning the Defendant's 'prior bad acts'" was covered by the hearing. As for the remaining motion for "disclosure of uncharged conduct on which the State intends to rely at trial," the trial court again noted its compliance with Rule 404(b).

---

[1] Although the prosecutor indicated such, Ms. Hurt did not testify at trial that she saw the two women leave together in the same vehicle.

Tennessee Rule of Evidence 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). Evidence of a defendant's prior crimes, wrongs, or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of "motive and common scheme or plan" to establish identity; (2) to establish the defendant's intent in committing the offense on trial; and (3) to "rebut a claim of mistake or accident if asserted as a defense." Thacker, 164 S.W.3d at 239 (citing State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996)). In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

The Defendant first takes issue with a procedural aspect of the rule, specifically the requirement that the court must hold a hearing outside the jury's presence. See Tenn. R. Evid. 404(b)(1). The Defendant acknowledges that the trial court did hold a hearing outside the presence of the jury but contends that the court "merely paid 'lip service' to the rule; no actual evidence was presented, only the assertions of counsel. . . . It is clear that 'hearing' means an evidentiary hearing." The State replies that "[t]o the extent that the Rule 404(b) hearing did not literally follow the procedure in terms of timing, the [D]efendant suffered no unfair prejudice."

The rule requires a hearing, outside of the jury's presence, sufficient for the trial court to consider the proposed evidence and make the additional determinations required by the rule. Motions in limine, which a Rule 404(b) motion is, are frequently decided merely on the

basis of statements or arguments of counsel setting out the proposed evidence. See State v. W.C. Chambers, No. 74, 1987 WL 18071, at *3 (Tenn. Crim. App. Oct. 7, 1997). Although the trial court did not view the videotape or hear proposed testimony at the pretrial hearing, the trial court was adequately informed about the evidence that the State sought to admit at trial when it made its ruling. Additionally, the trial judge noted its displeasure with counsel for not bringing the matter to the court's attention sooner, stating that if counsel had do so, then the court would have be able to conduct a full-blown hearing on the issue.

Moreover, both the State and the Defendant seem to imply that the trial court should have held the Rule 404(b) hearing prior to empaneling a jury. While certainly a pretrial hearing is permissible, our supreme court has cautioned trial courts that such rulings may have to be revisited based upon the evidence presented at trial:

> Although Rule 404(b) does not preclude the trial court from conducting a hearing or ruling prior to trial, we share the Court of Criminal Appeals' view that the Rule 404(b) criteria—in particular, the existence of a material issue at trial and the balancing of the probative value and unfair prejudice—require consideration of the evidence presented at trial. Thus, trial courts must be cognizant that if pretrial evidentiary rulings are made, they may need to be reconsidered or revised based on the evidence presented at trial.

State v. Gilley, 173 S.W.3d 1, 6 (Tenn. 2005). Here, following the arguments of counsel, the trial judge stated that after receiving the evidence at trial, he would declare a mistrial if he concluded that it did not comport with the conditions of Rule 404(b). We discern no error in the way the trial court conducted the Rule 404(b) hearing.

Next, the Defendant challenges the second prerequisite of Rule 404(b), arguing that the trial court "did not properly determine whether or not the conduct conforms with a character trait." The Defendant acknowledges that the trial court found that the evidence "'would go to identity . . . would go to scheme or plan . . . would go to motive . . . would go to intent, and it would go to knowledge.'" However, she submits that identity was not an issue in this case because "there [was] never any question of whether or not it was [the Defendant] at the store that day." She also claims that the evidence did not go towards proving her intent, doing "nothing to support or bolster a claim that [the Defendant] intended to commit the charged offenses[,]" and notes that a claim of accident or mistake was not asserted as a defense. She also takes issue with the third condition of Rule 404(b), contending that the trial court "put the proverbial 'cart before the horse'" in this regard when it found the proof established the other act by clear and convincing evidence as it not "actually view[ed] the proof" at that point. As for the fourth requirement of Rule 404(b), she again notes that the trial court made this determination before viewing the evidence and then

argues that this ruling was in error: "If the [t]rial [c]ourt were to view the evidence, they would have found that it was not only prejudicial to [the Defendant], but had very little probative value in that it was irrelevant to prove any of the exceptions and that it was only prejudicial propensity evidence[.]" The State responds that the evidence fell under the exceptions to Rule 404(b) and was admissible.

A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). An abuse of discretion occurs if the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (citations omitted).

Because we conclude that the trial court substantially complied with the procedural requirements of the rule, the Defendant will not be entitled to relief unless the court abused its discretion. Here, the Defendant claimed that she had no prior knowledge that Ms. Fiester planned to steal from the stores they visited that day and that she was merely present during Ms. Fiester's commission of the offenses. As indicated, the trial court ruled that the evidence was admissible to show motive, intent, guilty knowledge, identity of the Defendant, and the existence of a common scheme or plan. The trial court also determined that the probative value of the evidence outweighed any unfair prejudice to the Defendant and that proof of the other crime was clear and convincing.

In our view, evidence of the Defendant's behavior at Legacy Resale was admissible to establish intent on the part of the Defendant. A leading treatise on evidence provides as follows:

> Often the "intent" proof actually serves to disprove that the conduct was accidental or inadvertent. Intent is ordinarily inferred from evidence of the defendant's overall plan to commit such crimes or from proof of defendant's motive. A related inference is the inference that a person intended a certain result if he or she had previously acted in the same way and achieved the same result. This inference is stronger if the previous acts and results closely resemble those alleged in the instant case.

Neil P. Cohen, et al., Tennessee Law of Evidence § 4.04[10] (5th ed. 2005) (footnotes omitted).

The central issue was whether the Defendant knew her companion was going to steal from the employee at the Shop Around the Corner. During the trial, the Defendant attempted to demonstrate through cross-examination of the State's witnesses and through the testimony of her mother that she did not know of Ms. Fiester's plan to rob the store employee and was an unwitting participant in the crime. When the Defendant placed her knowledge and intent at issue, evidence of the Defendant's knowing participation in previous crimes with the same companion became highly probative. See State v. Antonio Dante Edmondson, No. M2006-00990-CCA-R3-CD, 2007 WL 2351169, at *6 (Tenn. Crim. App. Aug. 20, 2007) (in facilitation of aggravated robbery case, evidence of prior robberies was admissible to show intent where defendant had said in his statement to the police that he did not know of his companion's plan to rob the victims and was an unwitting participant in the crime); see also State v. Little, 854 S.W.2d 643, 649 (Tenn. Cirm. App. 1992) (evidence of prior drug transactions was admissible to show intent and to rebut defendant's contention that he was "a victim of circumstance"); State v. Jose Rodriguez and Eladio Caballero Sanchez, No. M2005-00951-CCA-R3-CD, 2006 WL 2310666, at *11 (Tenn. Crim. App. Aug. 7, 2006) (where defendants claimed that they had no prior knowledge of the drug deal, that they were unaware their cohort possessed drugs, and that they were merely present in the vehicle during the time alleged in the indictment, testimony that defendants were involved in selling drugs on prior occasions was admissible to establish defendants' intent to participate in conspiracy to possess marijuana with intent to sell or deliver and to rebut assertion that they were merely present), perm. app. denied, (Tenn. Dec. 27, 2006).

The Defendant takes issue with the fact that the trial court did not view the evidence at the pretrial hearing, but as previously discussed, we cannot conclude that the trial court abused its discretion by making these determinations based solely on the arguments of counsel. Moreover, the trial judge stated that he would revisit the issue if necessary after receiving the evidence at trial and that he would instruct the jury of the limited purpose for which the evidence could be considered.[2] When receiving the evidence at trial, the videotape and testimony of the witnesses was, with the minor exception noted above about the women leaving in the same vehicle, as described by the prosecutor during the discussion on the motion. The trial record supports the trial court's determinations that the evidence was admissible to prove the Defendant's intent, that the other crime was established by clear and convincing evidence, and that the probative value of the evidence outweighed the danger of unfair prejudice. Accordingly, we hold that the trial court acted within its discretion in allowing the evidence regarding the prior incident at Legacy Resale.

*II. Sentencing*

---

[2] Although the trial judge read its jury charge "on evidence of other crimes," the actual charge given to the jury is not included in the record on appeal.

The Defendant challenges both the length of her individual sentences and the imposition of consecutive sentencing. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). The defendant's potential for rehabilitation or treatment should also be considered. See Tenn. Code Ann. § 40-35-103(5).

Prior to trial, the State filed a notice of intent to seek enhanced punishment. The notice provided that the Defendant had prior convictions in North Carolina for manufacturing a controlled substance on December 3, 2003; breaking and entering on December 3, 2003; breaking and entering and larceny after breaking and entering on March 26, 2004; and possession of stolen goods or property on July 25, 2006. Three convictions from Florida were also listed: shoplifting on December 24, 1997; grand theft of a motor vehicle on February 6, 1998; and burglary of a dwelling on July 13, 1998. Different offense dates were reflected for each of the convictions listed in the notice. At the sentencing hearing, the State asked the court to sentence the Defendant as a Range III, persistent offender. See Tenn. Code Ann. § 40-35-107(a)(1) (A persistent offender is a defendant who has received "[a]ny combination of five (5) or more prior felony convictions within the conviction class or higher

or within the next two (2) lower felony classes, where applicable[.]"). The Defendant did not contest that she had the requisite convictions to establish the range.

The Defendant presented testimony from Doug Johnson, who testified that he worked in construction preforming "maintenance" in Mountain City. He had been in that line of business for about six months, and prior to that, he was engaged in "heavy equipment" work, digging houses and building roads. He met the Defendant on "a remodel job" where she was doing some yard work; he had known her for four or five years. At present, she was working with him, and they "were building a house together[.]" He was aware of the criminal charges pending against the Defendant when he hired her. Mr. Johnson opined that the Defendant did "good work" and that she was "very skilled" at what she did. If the Defendant were to be granted release, she could continue to work with Mr. Johnson as he still had "some work to do." On cross-examination, Mr. Johnson relayed that his business was not incorporated and that he paid the Defendant "under the table."

The 46-year-old Defendant testified on her own behalf at sentencing. Regarding her employment, the Defendant stated that she had not held a job that required a W-2 or received a paycheck from any kind of a company in many years. She asserted that she had been working "under the table" and for her parents. When asked about the type of work she did, the Defendant stated that she was skilled in many different trades and had engaged in such miscellaneous jobs as building decks and porches, landscaping, remodeling, re-paneling, flooring, building furniture, maintenance, buffing and waxing boats, footings and foundation work, roofing, siding, inside/outside framing, carpentry, air conditioning, plumbing, and electrical work. In addition, she had worked for "a little store and restaurant" cleaning and organizing things and had held several yard sales. She also cleaned a Roane Mountain home and did some other miscellaneous work for the owner.

The Defendant then narrated her life story, detailing her childhood experiences, three marriages, several miscarriages, drug usage, criminal history, mental history, and other happenings. During this narration, the trial court disclosed that he had received several letters from the Defendant's parents. In the letters, the Defendant's parents stated that their daughter had been framed, that she would never steal from anyone, and noted that she had a credit card to do with as she pleased. The Defendant admitted that she had taken advantage of her parents by allowing them to pay for her home, pay her bills, and give her a credit card. The Defendant possessed the credit card during the timeframe of the instant offenses and claimed she "never abused it."

The trial court opined that the Defendant had not been truthful with her parents because "the only way they could get the stuff they write" about was from the Defendant. The Defendant then stated that she maintained her innocence on the present charges. The

-16-

court reviewed a portion of the Defendant's criminal history with her. If released and required to stay in Tennessee, the Defendant claimed she could stay with some friends. The Defendant made a final plea for leniency.

The presentence report was entered into evidence. It reflected that the Defendant used three different social security numbers. The Defendant reported that she began using alcohol at age eight or nine; her current consumption was described as "to[o] much" and "to[o] often." Her illegal drug usage consisted of Loratabs, one to two monthly, since the age of 43. The Defendant claimed that she had received psychiatric treatment while incarcerated in North Carolina and Tennessee. Her mental health was reported as poor, and she stated that she had been diagnosed with Adult Attention Deficit Hyperactive Disorder and was taking medications for that.

The Defendant reported employment with multiple different employers both working as a skilled laborer and in the restaurant industry. She also reported that she obtained her G.E.D. in 2004 while in custody in North Carolina.

In addition to the convictions listed in the notice, the presentence report also showed two convictions for failure to appear and multiple driving offenses. For past offenses, the Defendant had served time in jail, had been confined with work release, had been ordered to pay restitution, had received substance abuse treatment, had been sentenced to community service, had been to DWI school, and had been placed on probation. According to the report, the Defendant's probation had been revoked on the March 26, 2004 convictions.

*A. Length*

The Defendant's conduct occurred after the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides, in part, that the trial court shall impose a specific sentence that is consistent with the purposes and principles of the 1989 Sentencing Reform Act. See Tenn. Code Ann. § 40-35-302(b). A separate sentencing hearing is not required in misdemeanor sentencing, but the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." Tenn. Code Ann. § 40-35-302(a). A misdemeanor sentence, unlike a felony sentence, has no sentence range. State v. Baker, 966 S.W .2d 429, 434 (Tenn. Crim. App. 1997).

The trial court is allowed greater flexibility in setting misdemeanor sentences than felony sentences. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The trial court, however, must impose a specific sentence for a misdemeanor conviction consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. Tenn. Code Ann. § 40-35-302(d); State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995). The trial court should consider enhancement and mitigating factors in making its sentencing determinations; however, unlike the felony sentencing statute, which requires the trial court to place its findings on the record, the misdemeanor sentencing statute "merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a

misdemeanor sentence to be served in confinement." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). In misdemeanor sentencing, the trial court retains the authority to place the defendant on probation either immediately or after a time of periodic or continuous confinement. Tenn. Code Ann. § 40-35-302(e)(1)-(2). The trial court is required to set a percentage of the sentence that the defendant must serve before becoming eligible for certain release programs. Tenn. Code Ann. § 40-35-302(d). Such percentage must not be more than 75 percent. Tenn. Code Ann. § 40-35-302(d).

Following her jury trial, the Defendant was convicted of theft of property valued at more than $500 but less than $1000, a Class E felony, and three counts of fraudulent use of credit card involving a value equal to or less than $500, a Class A misdemeanor. See Tenn. Code Ann. §§ 39-14-103, -105, -118. As a Range III, persistent offender, the Defendant faced a potential sentence of four to six years for her Class E felony theft conviction. See Tenn. Code Ann. § 40-35-112(c). The trial court imposed an enhanced sentence of five years. For the three Class A misdemeanor convictions, the trial court imposed sentences of 11 months and 29 days, with service set at 75 percent before eligibility for rehabilitative programs.

The record reflects that the trial court considered the evidence presented at trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

In setting the length of the Defendant's sentence, the trial court found two enumerated enhancement factors to be applicable to the Defendant. Those factors were: (1) The Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and (2) The Defendant was a leader in the commission of an offense involving two or more criminal actors. See Tenn. Code Ann. § 40-35-114(1) & (2). The trial court also considered the following important, "And more than anything else, that her unwillingness to acknowledge that she, in fact, committed these offenses the court finds that she's untruthful." The trial court determined that one mitigating factor applied, her criminal conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). Weighing these factors, the trial court then imposed an enhanced sentence of 5 years for the felony theft conviction and set service of the Defendant's misdemeanor sentences at 75 percent.

The Defendant argues that the trial court erred when it applied both of the enumerated enhancement factors. Opposing application of factor (2), the Defendant argues that "the evidence clearly preponderates against the determination [she] was a leader in the

commission of the offense when the testimony of her co-defendant, Ms. Fiester, clearly shows that the conduct was Ms. Fiester's idea, that Ms. Fiester concocted a plan, selected the target, and was the one who actually took the wallet." The State responds that the record supports application of this factor:

> The [D]efendant, by virtue of the active, necessary role she played in the theft, was a leader. She agreed to steal the money. The [D]efendant drove the vehicle to and from each establishment. By distracting the store clerk, she enabled her co-defendant to have time to look for money and wallets to steal. With the store clerk busy attending to her, her co-defendant could steal and get out without being apprehended.

We agree with the Defendant that the trial court erred in enhancing her sentence based on the determination that she was a leader in the commission of the offenses. There was no evidence presented at trial indicating that the Defendant planned the crimes or encouraged her co-defendant to participate in offenses. See State v. Freeman, 943 S.W.2d 25, 30 (Tenn. Crim. App. 1996) (holding that trial court erred in applying enhancement factor that defendant was leader in the commission of the offense because there was no evidence that defendant planned the encounter with the victim or that he requested or prompted others to participate). In fact, just the opposite was true. Ms. Fiester admitted that she devised the plan to steal the wallet from a local business employee, that she had previously engaged in this exact type of behavior, that she picked the businesses to target, and that she did the actual taking from the employee. We recognize that enhancement factor (2) does not require that the Defendant be the sole leader but rather that she be a "leader" and that, as a result, two criminal actors may qualify for enhancement under this factor. See State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993); see also State v. Robinson, 971 S.W.2d 30, 48 (Tenn. Crim. App. 1997) (concluding that all 5 defendants could properly be considered leaders in the offense, and further opining that "[o]ne may even act at the direction of another and be a leader in the offense"). Although it is true that the Defendant played an active role in the crimes, this fact alone is not sufficient to establish her as a leader in the commission of the offenses. To conclude otherwise would run afoul of the ordinary meaning of the term leader. Under the facts of the present case, the evidence does not suggest that the Defendant was a leader in the commission of the offenses according to Tennessee Code Annotated section 40-35-114(2). See, e.g., Freeman, 943 S.W.2d at 30; State v. Buckmeir, 902 S.W.2d 418, 423 (Tenn. Crim. App. 1995) (holding that trial court erred in applying the enhancement factor that defendant was the leader in the commission of the assault of the victim, where facts showing that defendant had sex with victim before informing co-defendant that he could have sex with victim were not sufficient to enhance defendant's sentence on this basis); State v. Adrian Porterfiled, No. W2006-00169-CCA-R3-CD, 2007 WL 3005349 *(Tenn. Crim. App. Feb. 6, 2007) (holding that factor was not applicable in voluntary manslaughter

case although the evidence showed that the defendant had a motive to kill the victim and that the defendant was the first to fire the shots), perm. app. denied, (Tenn. Oct. 15, 2007); State v. Mario Pendergrass, No. M1999-02523-CCA-R3-CD, 2002 WL 517133, at *17 (Tenn. Crim. App. Apr. 5, 2002) (holding that factor did not apply to kidnapping and robbery sentences when co-defendant arranged for the taxi cab, chose the driver, and obtained the shotgun used during the crimes), perm. app. denied, (Tenn. Oct. 7, 2002). But cf. Robinson, 971 S.W.2d at 48. As such, the trial court improperly applied enhancement factor (2).

However, we agree with the trial court's application of enhancement factor (1), that the Defendant had a previous history of criminal convictions in addition to those necessary to establish the range. The Defendant submits that the trial court's "understanding of [her] criminal history was too vague to determine whether or not she ha[d] a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." The Defendant focuses her argument on the fact that the trial court did not analyze the elements of her out-of-state convictions to determine the analogous felony in Tennessee. See Tenn. Code Ann. § 40-35-107(b)(5) (To satisfy a prior conviction for persistent offender status, a prior conviction includes "convictions under the laws of any other state, government or country which, if committed in this state, would have constituted an offense cognizable by the laws of this state.").

The Defendant does not cite to any law, and we are aware of none, that requires a trial court to engage in this type of comparison outside of the range classification context. Moreover, the notice contained more than the five felony convictions necessary to establish a Range III classification. The State also submitted the presentence report at the sentencing hearing, which listed two convictions for failure to appear and multiple driving offenses. It also reflected that the Defendant's probation had been revoked on the March 26, 2004 convictions for breaking and entering and larceny after breaking and entering. The record is more than sufficient to support the trial court's application of enhancement factor (1).

In addition to proper application of factor (1), the trial court also enhanced the Defendant's sentence based upon her untruthfulness at the sentencing hearing. Enhancement factors were rendered merely advisory by the legislative changes made to the Sentencing Act in 2005. See State v. Terry Wayne Hawkins, No. E2009-00044-CCA-R3-CD, 2010 WL 1068188, at *4 (Tenn. Crim. App. Mar. 24, 2010) (citing Tenn. Code Ann. § 40-35-210(c)). In assessing a defendant's potential for rehabilitation in an alternative sentencing context, this court has concluded that a trial court may consider a defendant's untruthfulness and lack of candor. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). It is also an acceptable consideration in determining the length of a term to be imposed, as such is consistent with the purposes and principles of the Sentencing Act. See Carter, 254 S.W.3d at 343 (citing Tenn. Code Ann. § 40-35-210(d)); see also Hawkins, 2010 WL 1068188, at

*4. Sentencing considerations include: "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." See Tenn. Code Ann. § 40-35-103(5).[3]

Although we conclude that the trial court erroneously applied enhancement factor (2), this error does not necessitate a sentence modification. See State v. Jackie Lynn Foster, Jr., No. E2007-01585-CCA-R3-CD, 2009 WL 3335580, at *19 (Tenn. Crim. App. Oct. 16, 2009) (citing State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995) ("The mere number of existing enhancement factors is not relevant—the important consideration being the weight to be given each factor in light of its relevance to the defendant's personal circumstances and background and the circumstances surrounding his criminal conduct.")), perm. app. denied, (Tenn. Apr. 14, 2010). Based on our review, we conclude that application of enhancement factor (1), coupled with the Defendant's untruthfulness with the court, support the trial court's discretionary decision to impose a sentence of five years for the theft conviction and set the percentage of service for the Defendant's misdemeanor sentences at 75 percent.

*B. Consecutive Nature*
The Defendant also challenges the consecutive nature of her sentences. Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
(2) The defendant is an offender whose record of criminal activity is extensive;
(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

---

[3] Prior to the legislative changes to the Act, this court had held that, because nonstatutory factors could not be used to enhance sentences, a defendant's lack of truthfulness was not a proper consideration for increasing the length of his sentence. See State v. Charles E. Swaffer, No. M2000-00058-CCA-R3-CD, 2001 WL 227354, at *7 (Tenn. Crim. App. Mar. 8, 2001), perm. app. denied, (Tenn. Sept. 24, 2001).

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. However, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2) & (4).

The trial court imposed consecutive sentences on the basis that the Defendant was an offender whose record of criminal activity was extensive. Tenn. Code Ann. § 40-35-115(b)(2). On appeal, the Defendant submits that the trial court also found that factor (1), the defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood, applied to the Defendant. The trial court discussed the probability that the Defendant would also meet the definition of a professional criminal under subsection (b)(3) but seemingly declined to apply that factor:

> If I look at consecutive sentencing, ma'am, I . . . probably pretty much agree with the attorney general that you probably do meet that definition of professional criminal. I haven't looked at those cases on that definition lately, but you devoted a life to criminal acts and made your sources of livelihood, but also you're a defendant who -- an offender who has a -- a criminal whose criminal activities are extensive.

Challenging the finding of an extensive criminal record, the Defendant again references the trial court's failure to engage in an analysis of the elements of the out-of-state offenses to determine the correspondent felony in Tennessee. Again, the Defendant has provided no support that this type of comparison is required outside the range classification context. Here, the record is replete with convictions reflecting an extensive history of criminal activity on the part of the Defendant. The presence of a single factor is enough to justify the imposition of consecutive sentencing. Under these facts and circumstances, partial consecutive sentencing is an appropriate and justly deserved sanction. We affirm the

sentence imposed by the trial court and conclude that it is no greater than that deserved for the offenses committed.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's convictions and sentences.

_____
D. KELLY THOMAS, JR., JUDGE